**FILED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

FEB 1 0 2020

MITCHELL R. ELFERS
CLERK

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

805 Cromwell Ave SW
Albuquerque, New Mexico
87102

)
)
)
)
)

Case No. 20mr270

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Please see attachment A

located in the _____Judicial_____ District of _____New Mexico_____ , there is now concealed *(identify the person or describe the property to be seized)*:
Please see attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 | Possession with Intent to Distribute 50 Grams or more of a Mixture and Substance Containing Methamphetamine |
| 21 U.S.C. §§ 846 | Conspiracy |

The application is based on these facts:
The affidavit of Task Force Officer Thomas Novicki is Incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Thomas D. Novicki, DEA Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Feb. 10, 2020

_____
*Judge's signature*

City and state: Albuquerque, New Mexico

John F. Robbenhaar, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF:

805 CROMWELL AVE SW,
ALBUQUERQUE, NM 87102

Case No. _____

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Thomas D. Novicki, a Task Force Officer with the Drug Enforcement Administration, United States Department of Justice, being duly sworn, do depose and hereby state the following:

## INTRODUCTION

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residence located at 805 Cromwell Ave SW, Albuquerque, New Mexico ("NM") 87102 ("**TARGET LOCATION 1**").  The location identified as **TARGET LOCATION 1** is the residence of Shaun Michael ANAYA, as further described in Attachment A, for the things described in Attachment B. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841 and 21 U.S.C. § 846 have been committed by Shaun Michael ANAYA (hereinafter referred to as "ANAYA"), and that information and items the government may rely upon to establish those violations are contained within **TARGET LOCATION 1**.

## THE TARGET LOCATION

**TARGET LOCATION 1**

ANAYA's Residence
805 Cromwell Ave SE,
Albuquerque, New Mexico 87105

1

## AGENT BACKGROUND

2.      I am presently employed by the Albuquerque Police Department and assigned to the Drug Enforcement Administration (DEA), Albuquerque District Office, Tactical Diversion Squad (TDS), as a Task Force Officer.  I have been a Task Force Officer with DEA since September 2010.  In addition, I graduated from the Albuquerque Police Department Academy in June 2002.  I have received specialized training in drug investigation matters, including, but not limited to, drug interdiction, drug detection, money laundering techniques and schemes, drug identification, and asset identification and removal from the City of Albuquerque Police Department.  In total, I have received in excess of 500 hours of comprehensive formalized classroom instruction in those areas outlined above.   My past duties include investigations on felony crimes, including, but not limited to, state and federal narcotics violations, aggravated battery, aggravated assault, kidnapping, homicide, criminal sexual penetration of minors and adults, and all related domestic violence situations.

I am familiar with the physical properties and characteristics of illegal drugs.  During the course of my official duties, I have regularly come in contact with marijuana, methamphetamine, heroin, cocaine (including crack cocaine), and fentanyl.

3.      As a result of my training and experience as a law enforcement officer, I am familiar with the manner in which illegal drugs are prepared and packaged for personal use as well as trafficking.

4.      This case is being investigated by the DEA. I have participated in the investigation of the offenses described below and make this affidavit based on my participation in the investigation, and based on reports and information made available to me by other agents and Task

2

Force Officers ("TFOs"), as well as other law enforcement authorities.

5.     The facts set forth in this affidavit are known to me as a result of my investigation and interviews with other agents and law enforcement officers.  These are not all the facts known to me throughout the course of this investigation, but rather only those that are essential to establish probable cause in support of the search and inspection of **TARGET LOCATION 1**, as detailed below.

6.     I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation.  I have developed information I believe to be reliable from additional sources including:

a.     Information provided by Special Agents ("SA"), Task Force Officers ("TFO"), and Intelligence Research Specialists (IRS) of the DEA, and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

b.     Results of physical surveillance conducted by agents during the investigation;

c.     A review of telephone toll records and subscriber information;

d.     A review of driver's license and automobile registration records;

e.     Records from commercial databases; and

f.     Records from the National Crime Information Center ("NCIC").

7.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search certain premises. This affidavit does not set forth all of my knowledge about this matter. This affidavit is intended to show only that there is sufficient

probable cause for the requested search warrant at the following premises: 805 Cromwell Ave SW; Albuquerque, New Mexico (NM) 87105 *(a residence used by ANAYA to facilitate his drug trafficking activities)*.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

8.    I believe there is probable cause that ANAYA has committed, is committing, and will continue to commit offenses involving violations of, *inter alia*:

  a.    *21 U.S.C. § 846 – Conspiracy to possess with intent to distribute and to distribute controlled substances;*

  b.    *21 U.S.C. § 841 – Distribution of controlled substances and possession with intent to distribute controlled substances; and*

  c.    *18 U.S.C. § 2 – Aiding and abetting.*

## EVIDENCE SOUGHT DURING SEARCH

9.    Based on my training, experience and participation in this, and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence which is discussed in detail in the following paragraphs includes controlled substances, paraphernalia for weighing, packaging and distributing controlled

substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

10. Individuals involved in illegal trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports, yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

11. Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances. Drug dealers commonly store these items on their person, in their residences, in their businesses, in the residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

12. Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money

owed to the trafficker by customers and by the trafficker to his/her suppliers. These items are often stored by drug dealers on their person or in their business, residences, and in vehicles.

13. Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, and passports and visas and their contents. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other media.

14. Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

15. Other evidence of transportation, ordering, possession and sale of drugs can include the following: telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books,

investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and vehicles. This type of documentation can be stored on digital media and concealed virtually anywhere.

16.     Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

17.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

18.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips,

7

check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

19.   The use of smartphones, tablets, cellular phones, and digital devices has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and

incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

20.    Information stored in electronic form on all computers and other computer-related digital media can provide evidence of drug trafficking and the identity of associates. For example, numbers stored in the telephones (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates. Cellular telephones and other communication devices can contain similar information.

21.    Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs. They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Digital still and video cameras are commonplace and may be used to record digital photographs or videos. All can be stored in computer hard drives and related digital media. Drug traffickers frequently use these devices to take their photographs and videos.

22.    Drug trafficking is a dangerous and violent endeavor, therefore subjects involved in illegal drug trafficking often utilize and maintain firearms and ammunition on their person or in their homes, businesses or cars in the course of conducting their illicit business to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

Firearms are often employed for intimidation, to commit violent acts, and to avoid arrest by law enforcement officers. Agents intend to search, and seize, any and all firearms and ammunition that may be found.

23.    I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

24.    Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packaging, documents and electronic storage devices (and their contents), evidence tending to show the distribution of drugs (such as IOUs, pay/owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

25.    Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts. These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

26.    Subjects will leave behind fingerprints and DNA evidence in houses, buildings, and in vehicles they operate, as well as drug residue, gun powder residue, and other physical evidence.

Agents intend to search for fingerprints, deoxyribonucleic acid ("DNA") samples, evidence of the presence of drugs, gun powder residue, and other elements of physical evidence that may be present.

27. A list of items agents seek authority to seize is in Attachment B.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

28. As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on/in **TARGET LOCATION 1**, in whatever form they are found. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers and other storage media such as computer hard drives, external hard drives, thumb drives, secure digital cards and other types of flash memory cards, compact disks and floppy disks, personal digital assistants (PDAs), smartphones, tablets, Black Berry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones. For this reason, I submit that if a computer or storage medium is found on/in **TARGET LOCATION 1**, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

29. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises and/or vehicle, for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises and/or vehicle, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness

11

of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.   *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

## PROBABLE CAUSE

30.   As a result of my personal participation in the investigation of ANAYA, I am

12

familiar with the facts and circumstances of the offenses described in this Affidavit. When I assert that a statement was made, I have either direct knowledge of the statement, or the information was provided by another law enforcement agent (who may have had either direct or hearsay knowledge of the statement), and I have either spoken to the agent or have read and reviewed the agent's report.

31.     The primary target of this investigation is, Shaun Michael ANAYA, (hereafter referred to as "ANAYA").

32.     Throughout this investigation, agents have learned that ANAYA is capable of suppling customers multiple ounces and pounds of methamphetamine in the Albuquerque metropolitan area. Agents know that ANAYA resides at **TARGET LOCATION 1.**

33.     During the course of this investigation, agents have obtained evidence of the drug conspiracy through surveillance, undercover, and UI statements, and previous UI controlled purchases.

34.     As described below in detail, agents believe that ANAYA unlawfully distributes methamphetamine throughout the District of New Mexico. The following is a summary of the pertinent portions of this investigation to this point.

**<u>Controlled Undercover Buy - October 2019</u>**

35.     In October 2019, members of the Albuquerque Police Department (APD) Central Narcotics Unit along with the Drug Enforcement Administration (DEA) Albuquerque District Office Tactical Diversion Squad (TDS) conducted an undercover (UC) buy/walk operation with an unwitting informant, Laura LUJAN.  DEA established surveillance at **TARGET LOCATION**

1. Agents advised the white Ford F-250 from the previous deal was inside the property at **TARGET LOCATION 1**.

36. On that morning, LUJAN advised the UC that her source of supply for methamphetamine (later identified as Shaun ANAYA) had called him/her and stated that he was willing to meet LUJAN and the UC on the west side of Albuquerque. LUJAN stated that he/she would meet the UC at the meet location and would get into the UC's vehicle. LUJAN told the UC that the buy would take place at 9600 Central Ave SW, Albuquerque, New Mexico.

37. Approximately twenty minutes later, the UC received a call from LUJAN. LUJAN advised that ANAYA just called. LUJAN stated that ANAYA said that he will be on his way in a bit, advising that he was "Washing it out." **Agents note: Washing it out is slang for cleaning methamphetamine with acetone. Acetone is used to clean any cutting agents or impurities out of the methamphetamine.

38. At approximately 11:47am, surveillance was established at the Vista Manufactured Home Community located at 9600 Central Ave SW. Several minutes later, surveillance units observed LUJAN arrive to the Vista Manufactured Home Community and park next to the UC. LUJAN exited her vehicle and got into the UC's vehicle. LUJAN advised the UC that ANAYA was almost at the meet location.

39. At approximately 12:20pm, agents observed ANAYA's white Ford F-250 leave **TARGET LOCATION 1**. Agents surveilled the White Ford F-250 as it left **TARGET LOCATION 1** to its arrival at the Vista Manufactured Home Community located at 9600 Central Ave SW. ANAYA parked in the office parking lot. The UC advised that the driver's window was rolled down and the UC identified the driver of the white Ford F-250 as ANAYA. The UC provided LUJAN with $900 dollars (OAF) official Advanced Funds prior to LUJAN exiting the

UC's vehicle and getting into ANAYA's truck. LUJAN advised the UC that ANAYA had to pick up the methamphetamine from a mobile home inside of the Vista Manufactured Home Community.

40. Surveillance units observed ANAYA leave the office parking lot, traveling through the mobile home community. ANAYA parked in a community parking lot off of Valle Vista Rd and Vista Loop. Surveillance units observed ANAYA exit his vehicle while LUJAN remained in the vehicle. DEA Group Supervisor (GS) Bryan Shields advised that the specific mobile home that ANAYA went to was two or three trailer spaces south of where ANAYA parked, citing the space is quite possibly #44. Soon after ANAYA's arrival to the mobile home, GS Shields observed him walking back to his truck. ANAYA backed out of the community parking lot and drove westbound through the park arriving back to the office parking lot. LUJAN exited ANAYA's truck and entered back into the UC's vehicle and gave the UC the methamphetamine that was just purchased from ANAYA. LUJAN exited the UC's vehicle and left the area. ANAYA also left the area.

41. The UC traveled to the APD special investigations division (SID) where the UC relinquished custody of the methamphetamine that LUJAN had purchased for the UC to DEA personnel. TFO Novicki, as witnessed by TFO Franklin, transported the methamphetamine to the ADO for processing. During the processing of the methamphetamine, TFO Novicki utilized a NIK field test kit on the exhibit. The field test kit returned a presumptive positive response for the presence of methamphetamine. On that same day, DEA personnel mailed the exhibit to the south central regional laboratory for analysis and safekeeping.

42. A Chemical analysis report received from the DEA South Central laboratory indicated the exhibit was identified as methamphetamine and had a Net Weight of 110.9 grams

15

with a 98% purity level. The amount of pure methamphetamine is 108.6 grams.

43.   The above-described event occurred in Bernalillo County, in the District of New Mexico.

### Controlled Undercover Buy - November 2019

44.   In November 2019, members of the Albuquerque Police Department (APD) Central Narcotics Unit along with the Drug Enforcement Administration (DEA) Albuquerque District Office Tactical Diversion Squad (TDS) conducted an undercover (UC) buy/walk operation with an unwitting informant, Laura LUJAN.  DEA established surveillance at **TARGET LOCATION 1.**  Agents on surveillance advised that ANAYA's white Ford F-250 was inside the property at **TARGET LOCATION 1**. Additionally, agents on surveillance advised that 9600 Central Ave SW, #44 had a silver Audi passenger car bearing New Mexico temporary license plate 19T-199635 parked in the front driveway.  According to New Mexico MVD, 19T 199635 is registered as follows:  Registered owner: Samir RODRIGUEZ; DOB#: 08-13-1992; NM OLN#: 507818820; Vehicle: 2008 Audi; VIN#: WAUDH74FX8N054550; Color: Silver.  Samir Rodriguez has an extensive criminal history that includes but not limited to, Aggravated Battery: Shooting at Dwelling or Occupied Building, Possession of a controlled substance, Possession of a Firearm or Destructive Device by a Felon, Conspiracy, and Murder. The abovementioned vehicle owned by Samir Rodriguez has also been documented in another DEA case as being the vehicle that arrived to a drug deal.

45.   On that morning, the UC advised that he/she placed a call to LUJAN and was awaiting a response.  Shortly thereafter, the UC stated that LUJAN got into contact with ANAYA. LUJAN advised that the buy location will be at the Vista Manufactured Home Community located

at 9600 Central Ave SW, Albuquerque, New Mexico, 87121.  Additionally, the UC advised surveillance units that LUJAN stated that he/she should be leaving soon and may have to go to ANAYA's residence.  A short time later, surveillance units observed LUJAN arrive at **TARGET LOCATION** 1.

46.    At approximately 10:43am, LUJAN left **TARGET LOCATION 1** southbound on 98th St SW and traveled to 9600 Central Ave SW.  Upon arrival to 9600 Central Ave SW LUJAN entered into the UC's vehicle.

47.    At approximately 11:12am, ANAYA left **TARGET LOCATION 1** in his white Ford F-250.  ANAYA traveled to the gas station located at 8th St and Bridge Blvd SW.  Shortly thereafter, ANAYA left the gas station and drove west on Bridge Blvd SW. A short time later, ANAYA arrived to Vista Manufactured Home Community located at 9600 Central Ave SW, Albuquerque, New Mexico, 87121.  ANAYA pulled into the office parking lot and parked next to the UC vehicle.  The UC provided LUJAN with $4200 dollars (OAF) official Advanced Funds prior to LUJAN exiting the UC's vehicle and getting into ANAYA's truck.  ANAYA and LUJAN traveled to and parked in a small community parking lot close to trailer #44.  SA Lemmon photographed ANAYA after he exited his truck. Photographs showed ANAYA walking empty handed to and enter into 9600 Central Ave SW, #44.  A short time later, GS Shields observed ANAYA walking back to his truck with a package in his left hand.

48.    At approximately 11:50am, the UC advised that LUJAN texted him/her saying that ANAYA is almost done.  Additionally, LUJAN advised the UC that ANAYA is wrapping up the meth.  Several minutes later, surveillance units observed ANAYA return to his truck carrying a package. ANAYA entered his truck and left the small community parking lot and drove toward the office parking lot.  ANAYA arrived to the office parking lot and parked by the UC.  LUJAN

exited ANAYA's truck and walked to the UC's vehicle. LUJAN opened the passenger door. Standing at the passenger door, LUJAN gave the UC one (1) pound of methamphetamine. While standing at the passenger door, LUJAN told the UC that ANAYA can get fake oxycodone pills if he/she was still interested. The UC deferred and advised he/she would be interested in buying fake oxycodone at another time. The UC left the meet area and proceeded to drive to the APD special investigations division (SID). At that same time, LUJAN also left the buy location. Shortly thereafter, surveillance units also observed ANAYA leaving the buy location.

49.   At approximately 12:47pm, ANAYA arrived back to **TARGET LOCATION 1**.

50.   At the APD special investigations division (SID), the UC relinquished custody of the methamphetamine that LUJAN had purchased for the UC to DEA personnel. TFO Novicki, as witnessed by TFO Franklin, transported the methamphetamine to the ADO for processing and safekeeping. During the processing of the methamphetamine, TFO Novicki utilized a NIK field test kit on the exhibit. The field test kit returned a presumptive positive response for the presence of methamphetamine. On that same day, the exhibit was mailed to the south central regional laboratory for analysis and safekeeping.

51.   A Chemical analysis report received from the DEA South Central laboratory indicated the exhibit was identified as methamphetamine and had a Net Weight of 445.9 grams with a 99% purity level. The amount of pure methamphetamine is 441.4 grams.

52.   The above-described event occurred in Bernalillo County, in the District of New Mexico.

## **CONCLUSION**

53.    Based on the foregoing information, there is probable cause to believe that ANAYA

is engaged in drug trafficking and has committed, is committing, and will continue to commit,

violations of 21 U.S.C. § 841 - distribution of controlled substances and possession with intent to

distribute controlled substances; 21 U.S.C. § 846 - conspiracy to distribute and possess with intent

to distribute controlled substances; and 18 U.S.C. § 2 – aiding and abetting, and that he is using

the identified location (**TARGET LOCATION 1**) to facilitate the commissions of these offenses.

54.    Based upon the information provided in this affidavit, I believe the items to be

seized, which are described in Attachment B for the property to be searched, as described in

Attachment A, will constitute admissible evidence of the violations outlined in this affidavit.


I swear that this information is true and correct to the best of my knowledge and belief.


_____
Thomas D. Novicki
Task Force Officer
Drug Enforcement Administration


Subscribed and sworn to before me
        this 10th day of February, 2020.

_____
THE HONORABLE John F. Robbenhaar
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### DESCRIPTION AND PHOTOS OF PROPERTIES TO BE SEARCHED

### TARGET LOCATION 1

805 Cromwell Ave SW; Albuquerque, NM 87105 consists of a lot with a fifth wheel travel trailer on it being used as the residence. The property is secured by a perimeter fence and had a corrugated aluminum gate allowing access to the property off of Cromwell Ave. A black mail box with 805 on the side of it precedes the entry gate. The property has two sheds: one positioned on the north side of the travel trailer and one positioned in the northeast corner of the property. As of 1/29/2020, the existing perimeter fence was replaced with a brownish corrugated material with wood accenting the center of the fence.

The Parcel ID of the property is: 1 013 057 516 039 40209.

The Legal Description of the property is: MAP 40 TR 27 A1 C2 E1A











## ATTACHMENT B

## PROPERTY TO BE SEIZED

All records, information, and evidence relating to violations of 21 U.S.C. § 841, 21 U.S.C. § 846, and 18 U.S.C. § 2, including:

1.  Controlled substances, including, but not limited to, cocaine, cocaine base, methamphetamine, heroin, oxycodone pills, fentanyl pills, and marijuana.

2.  Drug paraphernalia, including but not limited to, scales, packaging materials, items for packaging and handling drugs.

3.  Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4.  Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5.  Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6.  Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7.  Messages, notes, correspondence, and/or communications between drug trafficking associates.

8.  Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

9.  Indications of ownership or control over any vehicles located at the place to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11.   Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12.   Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13.   Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14.   Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15.   Firearms and ammunition, including but not limited to handguns, rifles, shotguns and automatic weapons.

16.   Property constituting evidence of the commission of the criminal offenses of 21 U.S.C. § 841, 21 U.S.C. § 846, and 18 U.S.C. § 2; contraband, and property designed and intended for use as the means for committing the criminal offenses of 21 U.S.C. § 841, 21 U.S.C. § 846, and 18 U.S.C. § 2; as well as paraphernalia used to prepare controlled substances for distribution and personal use.

17.   Any and all computers and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage *(such as hard disks or other media that can store data)*; any handmade form *(such as writing)*; any mechanical form *(such as printing or typing)*; and any photographic form *(such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies)*.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

The terms "storage medium" or "storage media" include any physical object upon which

computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory,

CD-ROMs, and other magnetic or optical media.